UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

LAWRENCE JACKSON                                    CIVIL ACTION

VERSUS                                              NUMBER: 14-2044

CAROLYN W. COLVIN, ACTING                           SECTION: "C"(5)
COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying Plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. docs. 15, 16).

Lawrence Jackson, Plaintiff herein, filed the subject applications for DIB and SSI benefits on March 14, 2012, alleging disability as of May 27, 2011.  (Tr. pp. 132-137, 138-144).[1/]  In a "Disability Report-Adult" form that appears in the administrative record below, the conditions limiting Plaintiff's ability to work were identified as back and neck injuries and hip problems.  (Tr. p. 161).  Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on July 13, 2012.  (Tr. pp. 91-94, 95-98).  Pursuant to Plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on March 25, 2013 at which Plaintiff

---

[1/] A review of the administrative record reveals that Plaintiff had filed a previous application for DIB on June 1, 2011 that was denied at the initial level of the Commissioner's administrative review process on August 4, 2011 and was not appealed further.  (Tr. pp. 77, 82).

and a Vocational Expert ("VE") appeared and testified.  (Tr. pp. 99-100, 33-75).  On June 11, 2013, the ALJ issued a written decision in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act.  (Tr. pp. 7-24).  The Appeals Council ("AC") subsequently denied Plaintiff's request for review of the ALJ's decision on August 1, 2014, thus making the ALJ's decision the final decision of the Commissioner.  (Tr. pp. 1-6). It is from that unfavorable decision that the Plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

On the first page of the memorandum supporting his cross-motion for summary judgment, Plaintiff frames the issues for judicial review as follows:

> (1) The ALJ failed to consider applicable Listings and did not provide any explanation for his finding that Jackson does not meet a Listing, when the record contains evidence appearing to meet at least three Listings and, therefore, establishing disability.[2]
>
> (2) The residual functional capacity (RFC) finding is not supported by substantial evidence.
>
> (3) Additional vocational expert testimony is necessary in order for the Commissioner to meet her burden of establishing that there are other jobs that Jackson can perform.[3]

(Rec. doc. 15-2, p. 1).

Relevant to the resolution of the foregoing issues are the following findings that were made by the ALJ:

---

[2] Later in his supporting memorandum, Plaintiff alters the phraseology of his first challenge in arguing that "[t]he ALJ failed to perform an analysis of whether Jackson meets or medically equals a Listing and the evidence of record appears to meet several Listings, requiring reversal under *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007)."  (Rec. doc. 15-2, p. 11).

[3] Just like he did with respect to his first challenge, Plaintiff elsewhere argues in his supporting memorandum that "[t]he ALJ relied on Vocational Expert testimony that allowed for a sit/stand option, when the ALJ's RFC does not permit Jackson to alternate sitting and standing."  (Rec. doc. 15-2, p. 20).

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2011.

2. The claimant is not engaged in substantial gainful activity since May 27, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: osteonecrosis of the left femoral head with mild osteoarthritis of the left hip (20 CFR 404.1520(c) and 416.920(c)).   *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is able to occasionally lift and carry twenty pounds and frequently lift and carry ten pounds, stand and walk four hours in an eight hour work day, [and] sit six hours in an eight hour workday.  He can occasionally climb ramps, stairs, ladders, ropes or scaffolds.  He can occasionally kneel, crouch, crawl and stoop.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 28, 1986 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 27, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 12, 13, 18, 19).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries:   (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.   *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992); *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).   If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.   42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420 (1970).   A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).   Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.   *Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).   The Court may not reweigh the evidence or try the issues *de novo*, nor may it substitute its judgment for that of the Commissioner.   *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985).   Conflicts in the evidence are for the Commissioner to resolve, not the courts. *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that he is disabled within the meaning of the Social Security Act. *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. *Harrell*, 862 F.2d at 475. In making this determination, the Commissioner uses the five-step sequential analysis set forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings;

2. an individual who does not have a "severe impairment" will not be found to be disabled;

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors;

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made;

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed;

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. *Bowen v. Yuckert*, 482 U.S. 137, 146 n. 5, 107 S.Ct. 2287, 2294 n. 5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. *Fraga*, 810 F.2d at 1304 (citing *Lawler v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988); *Fraga*, 810 F.2d at 1302.

The medical evidence that was generated during the relevant time period[4/] begins with a treatment note dated December 9, 2011 from Dr. Brian J. Ladner of the North Oaks Orthopaedic Clinic ("NOOC"). Plaintiff was described as a 25-year old male who was status post open reduction and internal fixation of a left femoral head fracture that had been performed at LSU in New Orleans on May 24, 2011 following a motor vehicle accident. Plaintiff was ambulating without any aids but continued to experience groin pain, especially with weather changes. Upon physical examination, Plaintiff had mild tenderness to palpation in the groin but was neurovascularly intact distally. Forward flexion was capable to 90 degrees, internal rotation was possible to 15 degrees, and external rotation could be accomplished to 30 degrees. X-rays revealed a well-healed femoral head fracture,

---

[4/] Under 20 C.F.R. §§404.1512(d) and 416.912(d), the Commissioner is charged with developing the medical history of a DIB/SSI claimant "... for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary or unless you say that your disability began less than 12 months before you filed your application." (Emphasis added). As Plaintiff filed his applications for Social Security benefits on March 14, 2012 and alleged disability as of May 27, 2011, which is less than 12 months earlier, the relevant period begins with the latter date.

with three headless screws seen traversing the old fracture line which appeared to be well-healed.   However, subtle changes of osteonecrosis could not be excluded.   Dr. Ladner advised Plaintiff that he could expect to experience some pain with weather changes and that he would likely have to permanently modify his activities in some unspecified respect. Plaintiff was to be considered for a psychiatric referral and was otherwise to return in six months for further follow-up of the pelvis.  (Tr. pp. 223-225).

Plaintiff returned to Dr. Ladner on January 31, 2012 and reported that Celebrex had been somewhat effective in relieving his pain and that he was ambulating without any increased difficulty.  Physical examination findings were unchanged.  In light of Plaintiff's complaints of anxiety and sleeping problems, he was to be referred to a psychiatrist and was given a prescription for Ambien as well as Celebrex.  (Tr. p. 222).  The administrative record also includes a physical therapy discharge note of this same date which reflects the discontinuation of services due to non-compliance with sessions.  (Tr. pp. 325-327).  By March 30, 2012, Plaintiff indicted that he was starting to experience some pain and tightness down the lateral aspect of his thigh.  Physical examination findings were the same except for positive tenderness along the vastus lateralis and IP band.  The impression was left femoral head fracture, status post open reduction, and internal fixation.  Plaintiff was prescribed compounded analgesic cream and physical therapy at which he was to begin stretching and range of motion exercises and was to return to Dr. Ladner on an as-needed basis.  (Tr. p. 230).

On April 18, 2012, chest x-rays were ordered after Plaintiff was diagnosed with a cough.  (Tr. pp. 241-242).  That testing went forward the following day and yielded negative results.  (Tr. p. 249).  On April 27, 2012, Plaintiff completed the Administration's

7

"Function Report-Adult" form that is designed to elicit information about how his conditions limited his activities.  There, Plaintiff indicated that due to what he referred to as hip replacement surgery he was unable to bend his knee or to bend over to pick up anything, that he could not lift heavy objects, that it was sometimes painful to even walk, and that without the help of family he was sometimes unable to use the bathroom, much less bathe or shower.  An average day consisted of tending to his personal hygiene needs, eating, taking his medication, and lying down.   Sleep was difficult without medication. Plaintiff was reportedly unable to put on socks, shoes, pants, or undergarments without assistance and was unable to lift his leg to get in the shower.  He did not prepare his own meals and apparently did no household chores or yardwork.  Plaintiff was able to drive but chose not to so as to avoid medication side-effects.  He was able to shop for clothing and personal items twice per month and he spent his free time watching television, lying down, and being visited by others.  Plaintiff's condition affected his ability to engage in a wide range of activities and he estimated that he could walk less than half a mile before needing to stop and rest for 15 minutes.  He used a prescribed crutch and a brace/splint on a daily basis and experienced drowsiness and dry mouth as a result of taking Tramadol.  (Tr. pp. 176-184).

On May 11, 2012, Plaintiff presented to the Family Health Care and Wellness Center ("FHCWC") in Hammond, Louisiana, for the purpose of establishing a relationship with a primary care physician.   He was evaluated by Nurse Practitioner ("NP") Cherie Cody. Presenting problems were:   major depressive disorder, single episode and mild in intensity; generalized anxiety disorder; acute sinusitis, unspecified; other disease of the nasal cavity and sinuses; esophageal reflux; articular cartilage disorder to the pelvic region

and thigh; joint pain to the pelvic region, thigh, and lower leg; muscle spasm; and, insomnia, unspecified.   Prescribed medications included Prilosec, Parafon Forte, Cymbalta, Norco, Ambien, Xanax, Cataflam, and Lortab.  Plaintiff was described as an individual who weighed 263.2 pounds and stood at 6'2", who smoked one-half pack of cigarettes per day, and who rated his pain level at a "6."   Plaintiff advised the examiner that his symptoms of anxiety/depression were improved with medication and did not interfere with the activities of daily living.   He also reported athralgias/left knee pain and hip muscle tightness at times but no muscle aches or weakness, back pain, swelling in the extremities, or exercise intolerance.   Upon physical examination, Plaintiff was observed to ambulate normally but there was tenderness to palpation of the left knee and hip but with normal gait and station and grossly intact nerves and sensation.   The assessment was joint pain in the pelvic region, thigh, and lower leg; esophageal reflux; major depressive disorder, single episode and mild; and, insomnia, unspecified.   Plaintiff was prescribed Norco, Parafon Forte, Prilosec, Cymbalta, and Ambien.  (Tr. pp. 273-276).

Plaintiff was seen again by Dr. Ladner on June 1, 2012, complaining of severe pain over the outside of his hip, especially with ambulation and an inability to sleep on that side. Flexion and rotation remained the same but there was exquisite tenderness over the greater trochanter and minimal pain in the groin.  Plaintiff remained neurovascularly intact distally and the right hip had a full range of motion with no tenderness to palpation.  X-rays revealed intact hardware with good maintenance of the reduction and good evidence of healing.  The impression was left greater trochanter bursitis.  Plaintiff was administered injections of Lidocaine and Kenalog, which provided good relief, and was also prescribed Tramadol, to return in six weeks for a re-check.  (Tr. pp. 291- 292).

On June 23, 2012, Plaintiff underwent a consultative evaluation by Dr. Cristino Dijamco.  Presenting issues were identified as a back injury and hip problems.  Plaintiff reported having last done construction work in 2010.  He also recalled his May 2011 motor vehicle accident with a resulting left hip fracture requiring surgery.  Left hip, knee, and lower back pain had persisted since then.  From a functional standpoint, Plaintiff could feed himself but needed assistance with his bottoms in dressing.  He estimated that he could stand for 10 minutes uninterrupted, 20 to 30 minutes in an eight-hour workday; could walk 2 to 3 minutes on level ground; and, could sit for 2 to 3 hours.  Plaintiff could do no lifting, drove very rarely, and was only able to do the dishes.  He exhibited a somewhat antalgic gait with a limp on the left side and appeared to have some difficulty in getting on and off the examination table and up and out of a chair.  Plaintiff claimed to need a single crutch on the left side.  There was no swelling, redness, or inflammation of any joint.  Grip strength was 5/5 and symmetrical with no spasms, good dexterity, and good grasping ability.

Further physical examination findings included severely decreased flexion of the lumbar spine and significantly reduced knee flexion on the left with complaints of severe pain.  Straight leg raising was negative in both the supine and sitting positions.  Plaintiff claimed to be unable to walk on his heels or toes or to squat.  Motor strength was 5/5 and symmetrical with no spasms, neurological deficits, or atrophy and deep tendon reflexes were 2+ and equal.  Lumbosacral x-rays taken at the time of the evaluation revealed no apparent acute abnormality.  The doctor also reviewed the records of Plaintiff's previous treatment with Dr. Ladner and noted that they were devoid of any complaints regarding the left knee or the back.  The impression was back injury and hip problems.  Dr. Dijamco

remarked that the physical examination findings were significant for a diminished range of motion to the left hip, with pain, and with the left knee and lumbar spine, contrary to what had been recorded by Dr. Ladner.  The use of an assistive device for ambulating was also a new development that had not been indicated by Dr. Ladner.  Dr. Dijamco additionally observed Plaintiff ". . . to have improved ambulation on his way out of the facility." Although lumbar spine flexion was diminished, ". . . this was not correlated with any radiological findings on x-rays of . . . [Plaintiff's] lumbosacral spine . . ." (Tr. pp. 251-254).

Plaintiff returned to FHCWC on July 6, 2012 for the purpose of obtaining lab results and for complaints of left leg pain.  Increased anxiety was noted since May of 2011 but Plaintiff was reportedly maintaining his functionality.  He also reported muscle aches to the left hip and lumbar back pain for seven days.  Upon physical examination, Plaintiff ambulated normally and had normal muscle strength and tone.  Although there was pain to palpation of the left hip, there was normal movement in all extremities and normal curvature of the thoracolumbar area.  The assessment was generalized anxiety disorder, pain in the pelvic region and thigh, and articular cartilage disorder to the pelvic region and thigh.  Plaintiff was prescribed Citalopram, Norco, and Xanax.  (Tr. pp. 277-279).

On July 10, 2012, an Examiner with the Social Security Administration made a formal request that Plaintiff's file as it was then extant be reviewed by a specialist in the field of orthopedics.  (Tr. p. 255).  That review was undertaken and completed on July 12, 2012 by Dr. Gerald Dzurik, who opined that Plaintiff was capable of performing a limited range of light-level work.  (Tr. p. 256).  It was on that basis that Plaintiff's applications for DIB and SSI benefits were denied at the initial level of the Commissioner's administrative review process on July 13, 2012.  (Tr. pp. 76-98).

Plaintiff returned to Dr. Ladner on July 20, 2012 and advised that although the injection that he had received at the beginning of June had "completely relieved all of his pain," that pain had since returned and was now at an "exquisite" level over the outside of the hip.   Range of motion was essentially unchanged and Plaintiff remained neurovascularly intact distally but he did continue to have exquisite point tenderness over the greater trochanter.   The impression was persistent greater trochanter bursitis.   In light of the previous favorable outcome that had been achieved, Plaintiff was administered a second set of injections of Lidocaine and Kenalog, was to return to the clinic in three months, and was to be referred to LSU for pain management.   (Tr. p. 290).

Plaintiff was next seen at FHCWC on August 8, 2012 for complaints of leg and left hip pain for the previous two weeks.   He reported muscle aches in the form of left hip pain but no muscle weakness, no back pain, and no swelling in the extremities.   Although range of motion was limited to an unspecified degree, a musculoskeletal exam revealed normal motor strength and tone, gait and station were normal, sensation was grossly intact, and deep tendon reflexes were 2+ bilaterally throughout.   The assessment was generalized anxiety disorder, joint pain in the pelvic region and thigh, and other disease of the nasal cavity and sinuses.   Plaintiff was prescribed Xanax, Lortab, and Pseudoephedrine Extended Release Tablets.   (Tr. pp. 280-283).

On August 27, 2012, Plaintiff presented to the Redi-Med Clinic complaining of left hip and knee pain for the previous two to three weeks unaccompanied by trauma.   He was prescribed Lortab and Motrin.   (Tr. pp. 270-271).   Plaintiff was next seen at FHCWC on September 10, 2012 for complaints of cold symptoms for two weeks as well as left leg pain. He was said to be "ambulating normally" at the time.   The assessment was generalized

anxiety disorder, pain in the pelvic region and thigh, other disease of the nasal cavity and sinuses, muscle spasm, and unspecified acute sinusitis.  Plaintiff was given prescriptions for Xanax, Cataflam, Pseudoephedrine, Parafon Forte, and Amoxicillin.  (Tr. pp. 284-287).

On October 7, 2012, Plaintiff was evaluated at the North Oaks Medical Center ("NOMC") Emergency Room ("ER") after exhausting his supply of medication and experiencing an increase in his pain over the previous five days that was further exacerbated by a spell of cold weather.  On presentation, Plaintiff rated his pain as a "10." Plaintiff reported to the attending ER physician that further surgery was being contemplated by Dr. Ladner because part of his hip was deteriorating.  He also related having twisted his leg the previous evening which was an additional factor precipitating his pain.  There were no other complaints, leg swelling, numbness, loss of use, or neck or back problems, just a worsening of his left hip pain secondary to activity and the weather. Plaintiff was neurovascularly intact distally and he was able to ambulate despite his musculoskeletal/arthritic left hip pain.   He was discharged in good condition with prescriptions for Lortab and Flexeril and instructions to follow-up with Dr. Ladner.  (Tr. pp. 263-268).

As instructed, Plaintiff returned to Dr. Ladner on October 16, 2012 and reported continued pain over the outside of the left hip.  Upon physical examination, Plaintiff had no tenderness in the groin but he did have exquisite point tenderness over the greater trochanter.   Plaintiff had a full range of motion in the right lower extremity with no tenderness to palpation and range of motion in the left lower extremity was only slightly limited.  The impression continued to be persistent greater trochanter bursitis.  Plaintiff declined another injection and was prescribed Tramadol and physical therapy.  (Tr. p. 289).

He was seen at North Oaks Rehabilitation Services ("NORS") on that same day and was scheduled to attend physical therapy sessions three times per week for six weeks. (Tr. pp. 323-324). Plaintiff was evaluated at NORS and commenced physical therapy on October 18, 2012 but apparently failed to return and was unable to be contacted after that date. (Tr. pp. 309-322). He was formally discharged from NORS on January 3, 2013 with the intended achievement goals not having been met. (Tr. pp. 306-308).

On January 15, 2013, Plaintiff was seen yet again by Dr. Ladner "... continuing to complain of pain in the groin ... [with] [n]o associated signs and symptoms ... [and] [n]o numbness or tingling." A right hip exam produced normal results. As for the left hip, Plaintiff was experiencing "... tenderness in the anterior" with some reduced range of motion but strength was 5/5. X-ray studies of the pelvis were interpreted by the radiologist as demonstrating osteonecrosis of the left femoral head with osteoarthritis of the left hip, similar to a previous study. As interpreted by Dr. Ladner, the x-rays revealed Plaintiff's hip hardware to be intact with good evidence of healing. The diagnosis was hip pain and fracture of the head of the femur, for which Plaintiff was prescribed Ultram, Norco, and Advil/Motrin. Given his continuing discomfort, Plaintiff was to be referred to pain management and was to return to Dr. Ladner on an as-needed basis. (Tr. pp. 293-294, 301-304).

By February 26, 2013, Plaintiff reported this his continued groin pain was unrelieved with Tramadol. A physical examination revealed tenderness in the anterior region of the left hip but normal strength and sensation. X-ray views of the hip showed that the installed hardware was intact but mild degenerative changes were noted circumferentially about the hip joint. At Plaintiff's request, a further intra-articular

injection was to be scheduled and Plaintiff was to return to NOOC in six months.  Xanax and Prilosec were prescribed.  (Tr. pp. 295-296).  The prescribed injection was performed at NOMC via fluoroscopic guidance on March 12, 2013.  During the course of that procedure, moderate osteoarthritic changes were noted and the left hip joint appeared to be loculated by septations, presumably as a result of scarring.  (Tr. pp. 297-300).

As noted earlier, a hearing *de novo* before an ALJ went forward on March 25, 2013. After being advised of his right to representation, Plaintiff elected to proceed with the hearing in a *pro se* capacity, signing a written waiver to that effect.[5/]  The documentary exhibits were then formally admitted into evidence.  In summarizing the proceedings and the issue before him, the ALJ aptly noted that in order to establish his entitlement to DIB, Plaintiff would have to prove that he became disabled prior to the date that he was last insured on June 30, 2011.  (Tr. pp. 35-38).

Plaintiff was then sworn and was questioned by the ALJ.  He was 26 years of age at the time, weighed 230 pounds, and stood at 6'2".  Plaintiff had three young children, one of whom he had joint custody with and who thus spent half of his time living with Plaintiff, who resided with his older sister.  Plaintiff had no source of income and relied entirely upon his sibling for support.  Interactions with his son were largely done from the sofa where Plaintiff spent the majority of his time lying down.  Despite having a driver's license, Plaintiff initially testified that he had not driven since his accident in May of 2011, later clarifying that he had actually driven short distances on occasion but that he became agitated when he came upon an 18-wheeler.  Plaintiff further explained that driving was difficult because his leg cramped up after sitting for long periods of time so he typically

---

[5/] (Tr. p. 131).

relied upon family members to transport him to doctors' appointments and the park where he would watch his son play.   Plaintiff also related that Dr. Ladner was contemplating another surgical procedure, possibly a hip replacement, but that nothing had been scheduled thus far.   Although the most recent injection had provided Plaintiff some relief, he did experience injection site soreness.   Plaintiff testified that he attended physical therapy from November or December of 2011 until February or March of 2012, possibly three or four sessions, until he discontinued under the advices of Dr. Ladner.   According to Plaintiff, Dr. Ladner had also prescribed the use of a cane to aid with walking long distances.   Without the use of such an assistive device, Plaintiff estimated that he could walk for less than half a block.

In answer to the ALJ's additional questions, Plaintiff testified that he had completed eleven grades of formal education and was obtaining on-the-job training in construction work before being involved in his motor vehicle accident in 2011.   Contrary to what he had reported to Dr. Dijamco and conveyed via a "Work History Report," Plaintiff testified that he had stopped working on May 27, 2011 as a result of the automobile accident.   In terms of past relevant work, Plaintiff had functioned as a crew member at a fast food restaurant, a concrete worker for a parking lot company, a furniture deliveryperson, and a construction worker for a temp agency from March of 2009 to August of 2010.   Plaintiff then testified that he actually continued to do construction work through May of 2011.   When asked why he was no longer able to work, Plaintiff testified that he experienced pain after walking too long and cramps in his leg if he sat for too long, two to three hours.   Bending over was also problematic.   Plaintiff indicated that he saw Dr. Ladner, NP Cody, and one Dr. Lattimore on a monthly basis in addition to the treatment he had received at the Redi-Med Clinic.   The

ALJ agreed to obtain Plaintiff's updated treatment records from NOOC.  Medications at the time of the hearing included Suboxone and Xanax, the latter of which had been prescribed by NP Cody as opposed to a psychiatrist or psychologist.  The Xanax was helpful in easing Plaintiff's mind and allowing him to rest.   Prescription pain medications included Ibuprofen, Lortab, Motrin, and Celebrex which were helpful in relieving his pain.  Plaintiff described his pain as radiating in nature from the hip to the knee, worse during weather changes, along with numbness in the thigh.  The injections that Plaintiff had received relieved his pain for four to five days and obviated the need for oral medications during that time.

When asked to describe a typical day, Plaintiff testified that he rose in the morning, tended to hygienic needs, and then sat and watched TV.  Aside from accompanying his children to the park, Plaintiff testified that he otherwise engaged in very little activity as he was nervous that his condition would deteriorate to what it once was following his accident.  He reportedly required assistance in putting on his trousers and would typically wait until his girlfriend came over for assistance.  In terms of household chores, Plaintiff initially disavowed performing any such activities but when prodded admitted that he was capable of lifting laundry items weighing up to 15 pounds, sweeping, loading the dishwasher, and microwaving food or making a sandwich but that his sister was generally opposed to him doing so.  He was able to go to the grocery after being driven there by his sister where he would shop with the aid of a motorized cart.  Plaintiff attended church on a weekly basis and visited with others provided that they came to his residence.  When he was not watching television, Plaintiff would read or play computer games two to three hours per day.  (Tr. pp. 38-69).

Thomas Meunier, a VE, was the next witness to take the stand.  He began by classifying the skill and exertional demands of Plaintiff's past work as follows:  fast food worker – medium, unskilled; concrete/construction worker – very heavy, unskilled; and, furniture deliveryperson – very heavy, semi-skilled.  The ALJ then posed a hypothetical question to the VE that assumed a person of Plaintiff's age, education, and work experience who could occasionally lift and carry 20 pounds and could frequently lift and carry 10 pounds; who could stand and walk for six hours per eight-hour workday; who could sit for six hours in an eight-hour workday; who could occasionally climb ramps, stairs, ladders, ropes, and scaffolds; and, who could occasionally stoop, kneel, crouch, and crawl.  Faced with that profile, the VE testified that the individual described in the hypothetical question would be unable to perform any of Plaintiff's past work.  However, the described individual could still function as a light or sedentary-level information clerk, booth cashier, surveillance system monitor, and various production jobs like freight and stock material movers, with sufficient numbers of such jobs existing in the national and local economies. Plaintiff had no questions for the VE and the hearing was concluded.  (Tr. pp. 70-75).  The ALJ subsequently issued his unfavorable decision on June 11, 2013.  (Tr. pp. 7-24).

Before turning to the specific challenges enumerated by Plaintiff, the Court pauses to note an issue that is of some significance as it relates to his application for DIB.  As discussed above, Plaintiff filed his applications for Social Security benefits on March 14, 2012, alleging disability as of May 27, 2011.  However, his insured status and consequent entitlement to DIB expired on June 30, 2011, a mere one month after the alleged disability onset date.  Complicating matters further, Plaintiff had filed a previous application for DIB on June 1, 2011 that was initially denied on August 4, 2011 and was not appealed (p. 1, n. 1

*supra*), a time period that is *res judicata* as between the parties.  *Califano v. Sanders*, 430 U.S. 99, 107-09, 97 S.Ct. 980, 985-86 (1977); *Muse v. Sullivan*, 925 F.2d 785, 787 n. 1 (5th Cir. 1991).  Even if that were not the case, for Plaintiff to demonstrate that he is entitled to DIB, he must prove not only that he is disabled but that he became disabled prior to the expiration of his insured status.  *Anthony*, 954 F.2d at 295.  "Any impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability."  *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir. 1985).

Plaintiff's first challenge to the Commissioner's decision relates to the ALJ's step three finding under §§404.1520 and 416.920 where he is charged with determining whether a claimant's condition meets or equals the criteria of one of those set forth in the Listing of Impairments, 20 C.F.R. Pt. 404, Subpt. P, App. 1.  Plaintiff argues that the ALJ failed to weigh his condition against the criteria of certain Listings, that the explanation that the ALJ provided with respect to the Listings that he did consider was insufficient under the teachings of *Audler v. Astrue*, 501 F.3d 446 (5th Cir. 2007), and that the medical evidence "appears" to satisfy the criteria of three particular Listings, thus establishing his entitlement to Social Security benefits.

In his written decision of June 11, 2013, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of May 27, 2011 and that he suffered severe impairments in the form osteonecrosis of the left femoral head with mild osteoarthritis of the left hip.  Proceeding to step three of the §§404.1520/416.920 analysis, the ALJ then considered whether Plaintiff had an impairment or combination of impairments that met or medically equaled one of those set forth in the Listing of Impairments, stating as follows:

> The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> Listings 1.06, 12.04 and 12.06 were specifically considered.

(Tr. p. 13).

After making an assessment of Plaintiff's residual functional capacity ("RFC") to work, the ALJ then discussed, in considerable detail, the testimonial and documentary evidence upon which his findings were based.  (Tr. pp. 13-16).

In *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), the Fifth Circuit found that an ALJ's failure to identify the listing for which the claimant's symptoms failed to qualify or to provide any explanation as to how he made that determination constituted error as ". . . '[s]uch a bare conclusion is beyond meaningful judicial review.'"  *Id.* (quoting *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996)(footnote omitted)).[6/]  Although an ALJ is not always required to do an exhaustive point-by-point discussion of the evidence, his decision must be susceptible of thoughtful court scrutiny.  *Id.*  However, even where a step three violation has occurred, such must be subjected to a harmless error analysis to determine whether the substantial rights of a party have been affected.  *Id.* (quoting *Mays*, 837 F.2d at 1364).  That showing typically requires a claimant to demonstrate that his impairment satisfies the criteria of a particular listing.  *Id.* at 448-49; *Hermosillo v. Astrue*, No. 10-CV-0198, 2011 WL 4528206 at *4-5 (N.D. Tex. Sept. 12, 2011), *adopted*, 2011 WL 4528374

---

[6/] In *Audler*, "... the ALJ summarily concluded that '[t]he medical evidence indicates that the claimant has status post lumbar laminectomy, cervical disc herniation, headaches and chronic neck and back pain, impairments that are severe within the meaning of the Regulations but not severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.'"  *Audler*, 501 F.3d at 448.

(N.D. Tex. Sept. 30, 2011); *Moore v. Astrue*, No. 07-CV-422, 2008 WL 4602732 at *2 (N.D.

Tex. Aug. 13, 2008).

Plaintiff argues that the medical evidence that was admitted below appears to

satisfy the criteria of Listings 1.02, 1.03, and 1.06 of the Listing of Impairments. Those

Listings provide that a claimant will be deemed disabled if he suffers from:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*:
> Characterized by gross anatomical deformity (e.g., subluxation,
> contracture, bony or fibrous ankylosis, instability) and chronic
> joint pain and stiffness with signs of limitation of motion or
> other abnormal motion of the affected joint(s), and findings on
> appropriate medically acceptable imaging of joint space
> narrowing, bony destruction, or ankylosis of the affected
> joint(s).
> With:
> > A. Involvement of one major peripheral weight-bearing
> > joint (*i.e.*, hip, knee, or ankle), resulting in inability to
> > ambulate effectively, as defined in 1.00B2b;
> or
> > B. Involvement of one major peripheral joint in each upper
> > extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting
> > in inability to perform fine and gross movements
> > effectively, as defined in 1.00B2C.
>
> \* \* \* \* \* \*
>
> 1.03 *Reconstructive surgery or surgical arthrodesis of a major
> weight-bearing joint*, with inability to ambulate effectively, as
> defined in 1.00B2b, and return to effective ambulation did not
> occur, or is not expected to occur, within 12 months of onset.
>
> \* \* \* \* \* \*
>
> 1.06 *Fracture of the femur, tibia, pelvis, or one or more of the
> tarsal bones.* With:
> A. Solid union not evident on appropriate medically
> acceptable imaging and not clinically solid;
> and
> B. Inability to ambulate effectively, as defined in 1.00B2b, and
> return to effective ambulation did not occur or is not expected
> to occur within 12 months of onset.

21

As can be seen, common to all three of the above-listed musculoskeletal impairments is the inability to ambulate effectively, with that inability having lasted, or being expected to last, for 12 continuous months from the date of onset. *See also* 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00(B)(2)(a).  The Regulations define an "[i]nability to ambulate effectively" as " . . . an extreme limitation of the ability to walk; *i.e.*, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00(B)(2)(b)(1).  The Regulations further provide that *"[t]o ambulate effectively*, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living." 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 1.00(B)(2)(b)(2).  Examples of ineffective ambulation include, but are not limited to, the following:

> the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.  The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

(*Id.*).

As this is a third-step inquiry under §§404.1520/416.920, it is the claimant who bears the burden of proving that his impairment or combination of impairments meets or equals a listing. *Crowley v. Apfel*, 197 F.3d 194, 198 (5th Cir. 1999).  "For a claimant to show

that his impairment matches a listing, it must meet <u>all</u> of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 891 (1990)(footnote omitted).

In addressing Plaintiff's first challenge, the Court initially notes that, throughout the administrative proceedings below, he made no specific argument to either the ALJ or the AC that his condition satisfied the criteria of Listings 1.02, 1.03, and/or 1.06 of the Listing of Impairments or any other listing, for that matter.  And unlike the precise factual scenario that was presented in *Audler* in which the ALJ failed to identify the specific listed impairment or even group of impairments for which the plaintiff's condition failed to qualify, the ALJ in the present case at least indicated that Plaintiff's impairments were being measured against the criteria of "... Listings 1.06, 12.04 and 12.06 ..." (Tr. p. 13).  The first listing identified by the ALJ, Listing 1.06, can quickly be disposed as not having been met.  In addition to the inability to ambulate effectively, Listing 1.06 preliminarily requires a femur fracture for which a "[s]olid union [was] not evident on appropriate medically acceptable imaging and [was] not clinically solid."  On that point, on December 9, 2011, Dr. Ladner interpreted x-ray studies of the same date as demonstrating "... a well-healed femoral head fracture, 3 headless screws are seen traversing the old fracture line which appears well-healed." (Tr. p. 223).  X-rays that were taken at the time of a subsequent visit with Dr. Ladner on June 1, 2012 revealed that the "... hardware is intact with good maintenance of the reduction, good evidence of healing." (Tr. p. 291).  Further radiologic studies performed at the time of a later evaluation by Dr. Ladner on January 15, 2013 were interpreted as "... show[ing] hardware is intact with good evidence of healing." (Tr. p. 293).

While the brevity of the ALJ's step-three findings may leave something to be desired, the evidence of record fails to satisfy even the preliminary criteria that Listing 1.06 requires.

Turning to the two other listings that Plaintiff argues were met but were not specifically mentioned by the ALJ, because the ALJ proceeded past step three of the §§404.1520/416.920 sequential analysis, he implicitly found that Plaintiff's impairments did not satisfy the criteria of Listings 1.02 or 1.03 or any other listing.  *Hernandez v. Heckler*, 704 F.2d 857, 860 (5th Cir. 1983); *Moore*, 2008 WL 4602732 at *2 n. 5.  As noted above, Listings 1.02 and 1.03, as well as Listing 1.06, all require proof of an inability to ambulate effectively for a continuous period of 12 months.  The language of Listings 1.03 and 1.06 also requires that the return to effective ambulation did not occur, or was not expected to occur, within 12 months of onset of the particular condition.  Unfortunately for Plaintiff, as will be discussed below, the objective evidence of record fails to satisfy the requirements of Listings 1.02, 1.03, or 1.06.

When seen by Dr. Ladner on December 9, 2011, just over six months post-surgery, Plaintiff was ambulating without the use of an assistive device, complaining only of groin pain, especially with weather changes.  A physical examination revealed mild tenderness to palpation of the groin; Plaintiff was neurovascularly intact.  Although Plaintiff was told that he could expect such pain with weather changes and that he would have to modify his activities as a result of his surgery, the extent and nature of that modification was unspecified.  Plaintiff was to be referred for psychiatric care and was to return to Dr. Ladner in six months; no specific treatment was administered and Dr. Ladner made no specific pronouncement that Plaintiff was disabled.  *Vaughn v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995)(citing *Harper v. Sullivan*, 887 F.2d 92, 97 (5th Cir. 1989)).  By the time of his

return to Dr. Ladner on January 31, 2012, there had been no increase in ambulatory difficulties from the previous visit and physical examination findings were unchanged. Plaintiff reported that Celebrex was somewhat helpful in relieving his pain.  A condition that can reasonably be controlled with medication or other treatment may properly be found to be non-disabling.  *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).  While Plaintiff cites to a physical therapy note of January 31, 2012 as containing findings evidencing a decreased range of hip motion and modified ambulation with the use of crutches bilaterally, a careful review of the cited note reveals that it was actually a "discharge summary" reflecting the discontinuation of such treatment due to "[n]on-compliance with therapy sessions.  Patient attempted with several phone calls, left v/m." (Tr. pp. 325-326).  The date of Plaintiff's initial PT evaluation at which the findings relied upon by him is not noted in the discharge summary but what is clear is that the Regulations impose an obligation upon social security claimants to follow the treatment prescribed by their physician.  20 C.F.R. §§404.1530, 416.930.  In any event, chronic hip pain, a preliminary requirement of Listing 1.02, is not apparent from either of Dr. Ladner's first two treatment notes.

Plaintiff returned to Dr. Ladner on March 30, 2012 and reported some pain and tightness down the lateral aspect of the thigh.  There was no groin tenderness and physical examination findings were otherwise the same except for positive tenderness along the vastus lateralis and IP band.  The diagnosis was essentially a recitation of Plaintiff's post-surgical status, *i.e.*, a left femoral head fracture, status post open reduction, and internal fixation.  The only treatment that was rendered by Dr. Ladner was a prescription for compounded analgesic cream and for physical therapy to commence stretching and range-

of-motion exercises, with Plaintiff to return on an "as needed" basis.  Contrary to what had

been recorded by Dr. Ladner, Plaintiff would later indicate on the Function Report that he

completed on April 27, 2012 that he used a prescribed crutch and brace/splint on a daily

basis.

Plaintiff was next seen by NP Cody on May 11, 2012, whose opinions must be duly

considered by the ALJ even though she is not considered to be an "acceptable medical

source" under the Regulations.   20 C.F.R. §§404.1513(a) and (d), 416.913(a) and (d);

*Boudreaux v. Soc. Sec. Admin.*, No. 13-CV-4949, 2014 WL 7339022 at *2 (E.D. La. Dec. 19,

2014).  The major problems identified by Cody were more non-exertional in nature such as

generalized anxiety disorder, the symptoms of which were improved with medication and

did not affect the performance of the activities of daily living.   Although Plaintiff

complained of hip muscle tightness at times, he had no muscle aches, weakness, back pain,

swelling, or exercise intolerance.   Tenderness to palpation of the left knee and hip was

noted on physical examination but Plaintiff was observed to ambulate normally with

normal gait and station and with grossly intact nerves and sensation.  The absence of any

more significant findings may properly be considered by an ALJ in adjudicating a claimant's

disability status;  *Clayborne v. Astrue*, 260 Fed.Appx. 735, 737 (5th Cir. 2008); *Adams v.

Bowen*, 833 F.2d 509, 512 (5th Cir. 1987).

What the foregoing medical records fail to establish, however, is <u>objective</u> evidence

of an inability to ambulate effectively for at least the time period between December 9,

2011 and May 11, 2012.  Absent such evidence, the requirements of Listings 1.02, 1.03, and

1.06 are not satisfied. *See Malta v. Astrue*, No. 10-CV-1320, 2010 WL 5139497 at *8-9 (N.D.

Tex. Dec. 17, 2010).  Admittedly, Plaintiff complained of significant pain over the outside of

the hip upon ambulation when seen again by Dr. Ladner on June 1, 2012. However, an injection produced good pain relief and Plaintiff was simply advised to return in six weeks. Plaintiff exhibited a somewhat antalgic gait with a limp when evaluated by Dr. Dijamco on June 23, 2012 but straight leg raising was negative, motor strength was 5/5 and symmetrical with no spasms, neurological deficits, or atrophy, and deep tendon reflexes were 2+ and equal. Dr. Dijamco remarked that Plaintiff's complaints and even some of the physical examination findings were at odds with what had been recorded by Dr. Ladner and certain objective test results. Indeed, Dr. Dijamco observed Plaintiff to have improved ambulation as he exited the clinic, an observation that the Court is hardly in a position to second-guess. By the time that he was seen again by NP Cody on July 6, 2012, Plaintiff had normal ambulation with normal muscle strength and tone and normal movement in all extremities. He returned to Dr. Ladner for a second injection on July 20, 2012 and although the treatment note from that date was silent as to Plaintiff's ability to ambulate, he remained neurovascularly intact distally. Plaintiff was administered another injection, was to return in three months, and was referred for pain management. As far as the record reflects, there is no indication that Plaintiff followed that prescribed course of treatment as the Regulations require. 20 C.F.R. §404.1530, 416.930.

Plaintiff complained of leg and left hip pain of two weeks' duration on August 8, 2012 but there was no muscle weakness, no back pain, and no swelling in the extremities. Although range of motion was limited to some unspecified degree, a physical examination revealed normal motor strength and tone and normal gait and station with grossly intact sensation and 2+ reflexes. On September 10, 2012, when Plaintiff returned to NP Cody for complaints of cold symptoms of two weeks' duration and left leg pain, he was said to be

"ambulating normally."   Plaintiff experienced a spike in his pain secondary to having exhausted his supply of medication, twisting his leg the previous evening, and a spell of cold weather on October 7, 2012, but there was no swelling, numbness, loss of use, or neck or back problems and Plaintiff was neurologically intact and ambulatory.   Dr. Ladner noted no ambulatory difficulties when he next saw Plaintiff on October 16, 2012.   The diagnosis was persistent greater trochanter bursitis and Plaintiff was prescribed only Tramadol and physical therapy.   Once again, Plaintiff failed to follow that recommended course of treatment, appearing for an initial evaluation at NORS on October 18, 2012 but thereafter apparently failing to return and being formally discharged for non-compliance on January 3, 2013.   No ambulatory deficits were noted by Dr. Ladner on January 15, 2013; medications were prescribed and Plaintiff was referred to pain management and was to return on only an "as needed" basis.   At his final visit to Dr. Ladner on February 26, 2013, Plaintiff had normal strength and sensation despite tenderness to the anterior region of the left hip.   Xanax and Prilosec were prescribed, a further injection was to be scheduled, and Plaintiff was to return to the clinic in six months.

Plaintiff argues, rather unforcefully, that the foregoing evidence "appears" to satisfy the "inability to ambulate effectively" requirement of Listings 1.02, 1.03, and 1.06.   He also argues that the added criteria of Listings 1.03 and 1.06, that the return to effective ambulation did not occur within 12 months of onset, is established because his hip surgery was in May of 2011 and at the March 2013 administrative hearing he testified that he was still unable to ambulate effectively.   What the law requires, however, is that a claimant's subjective complaints, like the testimony that Plaintiff provided at the hearing before the ALJ, be supported by the objective evidence of record.   *Falco v. Shalala*, 27 F.3d 160, 164

(5th Cir. 1994).   As the underline objective evidence summarized above makes clear, Plaintiff had returned to effective ambulation no later than December 9, 2011, just over six months following his surgery, and he was ambulating normally at least through May 11, 2012. Normal ambulation with normal muscle strength and tone were also undoubtedly present on July 6, August 8, and September 10, 2012.

Plaintiff additionally faults the ALJ for failing to consider x-ray evidence of osteonecrosis from December of 2011 and January of 2013, arguing that "[t]he ALJ's decision does not acknowledge the significance of this evidence and it appears that the ALJ may be unaware what [o]steonecrosis is."   (Rec. doc. 15-2, p. 14).   However, the mere existence or diagnosis of a condition and its attendant symptomology does not equate with a finding of disability under the Social Security Act.  *Randall v. Astrue*, 570 F.3d 651, 658-59 (5th Cir. 2009).  Rather, the appropriate inquiry is whether a claimant's impairments result in functional limitations which render him unable to perform his past work or any other work.  *Trenary v. Bowen*, 898 F.2d 1361, 1364 (8th Cir. 1990).   In fairness, while the radiologist who oversaw the x-rays of December 9, 2011 felt that "[s]ubtle changes of osteonecrosis cannot be excluded," Dr. Ladner's treatment note of that same date contains no specific diagnosis or impression of that condition.  Similarly, x-rays taken on January 15, 2013 were interpreted by the radiologist as demonstrating osteonecrosis of the left femoral head but Dr. Ladner's diagnosis was hip pain and fracture of the head of the femur. In any event, how Plaintiff was prejudiced by the ALJ's handling of osteonecrosis is not apparent, as the ALJ specifically found that it was a severe impairment.  (Tr. p. 12).  Without underline objective evidence establishing that Plaintiff failed to return to effective ambulation within 12 months of onset and that he was unable to ambulate effectively for a continuous period

29

of 12 months, the requirements of Listings 1.02, 1.03, and 1.06 were not met and any error on the part of the ALJ at step three of the §§404.1520/416.920 analysis was harmless. *Malta*, 2010 WL 5139497 at *8-9.

In his second challenge to the Commissioner's decision, Plaintiff alleges that the ALJ's assessment of his residual functional capacity ("RFC") to work is not supported by substantial evidence. More particularly, Plaintiff argues that the ALJ failed to include in his RFC assessment limitations resulting from all of his impairments; that although the ALJ found that he suffered from the severe impairment of osteonecrosis, the ALJ adopted the RFC findings of Dr. Dzurik, the non-examining state agency medical consultant, which was not based on osteonecrosis; that Dr. Dzurik was apparently unaware of x-ray evidence of osteonecrosis; and, that nothing in the ALJ's decision makes it clear that he was aware of what osteonecrosis is or its significance to Plaintiff's case. Second, Plaintiff argues that the ALJ's evaluation of his credibility is flawed in that the x-ray evidence of osteonecrosis provides strong objective support for his subjective complaints of pain and limitations in walking and standing; that the ALJ mischaracterized his hearing testimony and engaged in "picking and choosing" evidence bearing on his credibility; and, that the ALJ failed to acknowledge that the treatment that he has received provided nothing more temporary pain relief. Under the rubric of this challenge, Plaintiff additionally argues that the ALJ failed to fulfill his heightened duty to develop the record in light of the fact that Plaintiff was unrepresented at the administrative hearing.

In addressing this challenge, the Court initially notes that although Plaintiff generically identified "hip problems" as a disabling condition in the related paperwork accompanying his applications for Social Security benefits, he did not specifically identify

osteonecrosis as a disabling condition. *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989). Nevertheless, based upon the medical evidence that was presented, the ALJ found that Plaintiff suffered from osteonecrosis of the left femoral head with mild osteoarthritis of the left hip, conditions that are severe but, as discussed above, failed to satisfy the criteria of any of those set forth in the Listing of Impairments.   Having so found, the Regulations mandated that the ALJ make an assessment of Plaintiff's RFC, a term of art that embraces a claimant's ability to work despite his physical and/or mental impairments.   20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), 416.945; *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988).   Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining a claimant's RFC is reserved to the Commissioner and at the hearing level, that assessment is entrusted to the ALJ.   20 C.F.R. §§404.1527(e)(2), 404.1546(c), 416.927(e)(2), 416.946(c).

While Plaintiff argues that the ALJ failed to include in his RFC assessment limitations resulting from all of his impairments, he fails to identify any such omitted limitations or any other impairment(s) that he was purportedly suffering from.   And contrary to Plaintiff's present assertion, a fair reading of the ALJ's decision reveals that he carefully considered <u>all</u> of the evidence of record in arriving at Plaintiff's RFC to work.

After making his step-three finding, the ALJ set forth his assessment of Plaintiff's RFC to work, following which he methodically discussed all of the evidence of record and that upon which he relied in making the RFC determination.   (Tr. pp. 13-16).   The ALJ first recalled Plaintiff's hearing testimony before summarizing the medical records that were before him.   The first of those was from Plaintiff's initial evaluation by Dr. Ladner on December 9, 2011.   That evaluation was based, in part, on x-rays of the same date from

which subtle changes of osteonecrosis could not entirely be ruled out by the radiologist but which were interpreted by Dr. Ladner as simply demonstrating a well-healed femoral head fracture with hardware in place.  Dr. Ladner's findings were duly cited by Dr. Dzurik in reviewing Plaintiff's applications for Social Security benefits at the initial level of the Commissioner's administrative review process.  (Tr. p. 86).  In addition to Dr. Ladner, the ALJ properly discussed the findings of NP Cody, records from Redi-Med and the NOMC ER, and the consultative evaluation report from Dr. Dijamco.  (Tr. pp. 14-16).  Having considered that body of evidence, the ALJ then explained why Plaintiff's subjective complaints were credible only to the extent that they were supported by the objective evidence before him.  Dr. Ladner's medical records, for example, consistently revealed no evidence of numbness or tingling or bowel or bladder dysfunction.  Plaintiff was neurovascularly intact throughout with only intermittent minimal groin pain, no tenderness to palpation, and normal muscle strength with a full range of motion.  Although Plaintiff on occasion experienced pain over the greater trochanter with point tenderness, it was relieved with injections as Plaintiff acknowledged at the administrative hearing.  To be considered disabling within the meaning of the Social Security Act, pain must be "... constant, unremitting, and wholly unresponsive to therapeutic treatment."  *Hames v. Heckler*, 707 F.2d 162, 166 (5th Cir. 1983).

Continuing, the ALJ noted that when Plaintiff was first seen by Dr. Ladner in December of 2011, he ambulated without assistance and there was no increase in ambulatory difficulties by the following month.  This is contrary to what Plaintiff reported to Dr. Dijamco and what he testified to at the administrative hearing where he indicated that a cane had been prescribed by Dr. Ladner.  Similarly, while Plaintiff testified that Dr.

Ladner had discussed hip replacement surgery with him, the doctor's contemporaneous treatment records make no mention of any such procedure.  The ALJ further noted that although Dr. Ladner had referred Plaintiff for PT and pain management on a number of occasions, there is no objective evidence that Plaintiff availed himself of those recommended modalities.  With particular respect to the prescribed PT, other than appearing for an initial evaluation on October 18, 2012, as far as the record reflects Plaintiff did not appear for any treatment sessions whatsoever, being formally discharged for non-compliance on two separate occasions.  Yet, Plaintiff testified at the administrative hearing that he attended PT sessions from November/December of 2011 until February/March of 2012, ultimately discontinuing PT on the advices of Dr. Ladner.  Conspicuously absent from any of that doctor's multiple subsequent treatment notes, however, is any advice to discontinue PT.

Other factors affecting Plaintiff's credibility and, consequently, the veracity of his subjective complaints were the activities that he admitted that he was capable of performing at the hearing before the ALJ including routine household chores, preparing simple meals, and walking to the park with his children.  Plaintiff's ability to perform such activities is not indicative of someone who is unable to perform any work activities whatsoever. *Leggett v. Chater*, 67 F.3d 558, 565 n. 12 (5th Cir. 1995).   The Court also notes that contrary to the testimony that he provided at the administrative hearing that he continued to work up until the motor vehicle accident in May of 2011, in the Work History Report that he completed on April 27, 2012, a report that may properly be considered in determining a claimant's disability status, *Vaughan*, 58 F.3d at 131, Plaintiff indicated that he had actually stopped working in July of 2010.  (Tr. p. 168).

After providing additional reasons why Plaintiff's depression and anxiety were not considered to be severe impairments, the ALJ quite clearly stated that his RFC assessment was based on his review of the record as a whole, giving "great weight" to the findings of Drs. Dzurik, Dijamco, and Ladner and "some weight" to the findings of NP Cody and the attending healthcare personnel from Redi-Med and the NOMC ER.  (Tr. pp. 17-18).  While acknowledging that he was giving Dr. Dzurik's findings "great weight," the ALJ specifically noted that the conclusions that the two of them had reached had been arrived at "... under different rationales." (Tr. p. 17).  As a fair reading of the ALJ's written decision thus reveals, the ALJ's RFC assessment was not based solely on the findings of Dr. Dzurik which, in turn, were based in part on Dr. Ladner's treatment records that were then extant and the x-ray evidence upon which Dr. Ladner relied.

As for Plaintiff's contention that the ALJ shirked his heightened duty to develop the record, he points to no evidence that would have been uncovered had the ALJ proceeded more diligently.  To the contrary, a review of the administrative record readily establishes that the ALJ fully developed the facts of the case, including obtaining updated records from Dr. Ladner as he promised at the administrative hearing where Plaintiff elected to proceed *pro se* but had retained counsel by the time that the case had moved on to the AC level.  (Tr. pp. 58-59, 74-75).  This challenge is without merit.

Plaintiff's third and final challenge to the Commissioner's decision is that the ALJ relied on testimony from the VE that allowed for a sit/stand option but that the RFC assessment that the ALJ ultimately adopted does not contain any such option.

At the administrative hearing that was held on March 25, 2013, the ALJ posed the following hypothetical question to the VE and the following exchange ensued:

ALJ:   Okay.  I'm going to give you a hypothetical.  Assume the hypothetical individual with the claimant's, the claimant's age and education, and further assume – and the jobs you just described, and further assume that this individual's limited to occasionally lifting and carrying 20 pounds, can frequently lift and carry 10 pounds; can stand and walk 4 hours in an 8-hour work day; can sit 6 hours in an 8-hour work day; can occasionally climb ramps and stairs; can occasionally climb ladders, ropes, and scaffolds; can occasionally stoop; can occasionally kneel; can occasionally crouch and can occasionally crawl.  Given that hypothetical, can the hypothetical individual perform any of the past jobs you just described as actually performed or generally performed in the national economy?

VE:    No, sir.

Q.     Can a hypothetical individual perform any other work, and if so, could you give me a few examples of the number of jobs for each occupation?

A.     Yes.

Q.     And with the standing and walking go on four it's sedentary.  It's limited to sedentary work.

A.     Well, it's, it's really more apply (sic) described as the lifting range of light.

Q.     Um-hum.

A.     But mostly sedentary.

Q.     Right.

A.     There would be some light work that would still fit this.

Q.     Okay.

A.     All right.  I guess I'll start with that.  Information clerk would be a job that would be a light, unskilled job with a sit/stand option.

Q.     Okay.

A.     The <u>DOT</u> number is 237.367-018.   The numbers in Louisiana economy are 1,388.  And in the U.S. economy, 86,624.  Staying in that same category, dropping down to sedentary information clerk.

Q.     Okay.

A.     The <u>DOT</u> for that is 237.367-046.   In the state of Louisiana at the sedentary, unskilled level there's 1,390 sedentary, unskilled, and in the U.S. economy, 86,626. Booth cashiering would be another sedentary or light job that would certainly have a sit/stand option.   It's mostly sedentary.

Q.     So is the exertional level you're about to give me is light sit/stand option?

A.     It's light, but I'm going to give you both the light reduced and I'm going to give you the sedentary.

Q.     Okay.

A.     So this light, unskilled, 211.462-010.   In the state of Louisiana at the light, unskilled level there are approximately 2,373 of light, unskilled jobs that would have a sit/stand option, and in the U.S. economy, 114,792.   Sedentary, unskilled cashiering is the same <u>DOT</u> but --

Q.     And that's the booth cashier?

A.     Yeah.

Q.     Okay.

A.     So it's the same <u>DOT</u> I just gave you, but I'm going to give you the sedentary numbers now.  They're smaller than the light.  In the state of Louisiana there are 1,612 sedentary, unskilled, and U.S. economy, 82,102. Surveillance system monitor would be another job that would be a sedentary, unskilled job.

Q.     I'm sorry, surveillance systems --

A.     Surveillance systems monitor.

Q.      And that's at sedentary?

A.      Yeah, I have to find it.  It's 379 – yes, sir, sedentary, unskilled, 379.367-010.  In the state of Louisiana, 235 sedentary, unskilled.  U.S. economy sedentary job category, 17, 056.  And then there would be any number of, of production jobs, which are basically sit down, sedentary, unskilled jobs.  Do you want some examples of that?

Q.      Can you give me one example of those?

A.      Category of what's titled a laborers, freight, stock and material movers, hand, and it's labeled as freight, stock material movers, hand.

Q.      I'm sorry, laborers freight stock --

A.      Laborers, fr[e]ight, stock movers, hand.  A representative DOT at the sedentary level is 529.687-138.  That's a sedentary, unskilled job.  It's an SVP: 1 job.  In the state of Louisiana at that exertional and skill level there are 859 jobs, and in the U.S. economy, 48,657.

Q.      And this is only a sampling of the jobs?

A.      That's just a sampling of production.

Q.      Okay.  Or a sample of the jobs with that hypothetical?

A.      Right, right.

Q.      And your testimony is consistent with the DOT?

A.      Yes, sir.

ALJ:    Thank you.  Do you have any questions for Mr. Meunier?

CLMT: No, sir.

(Tr. pp. 71-74).

As noted above, the individual described in the ALJ's hypothetical was capable of standing and walking for four hours out of an eight-hour workday and for sitting six hours

out of an eight-hour workday.  Obviously, if the individual was not able to stand/walk uninterrupted for eight straight hours or to sit uninterrupted for eight straight hours, the other four and two hours, respectively, could be devoted to the other activity.  This is not a case where the ALJ specifically found that the claimant required a sit/stand option and then denied benefits by relying on the Medical-Vocational Guidelines.  *Scott v. Shalala*, 30 F.3d 33, 34-35 (5th Cir. 1994).  Rather, based upon the testimony that the VE provided, it is apparent that he was aware of this practical implication in recognition of the common workplace accommodation that an employee be allowed to alternate between sitting and standing.  *See, e.g., Jones v. Apfel*, 174 F.3d 692, 694 (5th Cir. 1999).  Plaintiff's stated need to get up to stretch, as he testified to at the administrative hearing, lacks objective support in the record and could easily be accomplished during the interruptions in standing/walking and in sitting that were allowed in the ALJ's RFC assessment.  The ALJ's fifth-step finding regarding Plaintiff's ability to perform the alternate work identified by the VE has not been rebutted here.  *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that Plaintiff's motion for summary judgment be denied, that Defendant's motion for summary judgment be granted, and that Plaintiff's suit be dismissed.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within 14 days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that

such consequences will result from a failure to object. *Douglass v. United States Auto. Assoc.*, 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __26th__ day of __October__, 2015.

_____
MICHAEL B. NORTH
UNITED STATES MAGISTRATE JUDGE